Filed 5/20/22  In re E.G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.G., JR., et al., Persons Coming Under the Juvenile Court Law. | B315741<br><br>(Los Angeles County Super. Ct. No. 18CCJP00869F, G) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>N.V.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

N. V. (Mother) appeals an order terminating parental rights. (Welf. & Inst. Code, § 366.26.)[1]  The children's paternal grandmother (PGM) is adopting them.  Mother contends that the Los Angeles County Department of Children and Family Services (DCFS) failed to interview extended family members about their ancestry under the Indian Child Welfare Act of 1978 (ICWA).  (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.)

Mother, an immigrant from Mexico, denied Indian heritage and never, since 2018, claimed otherwise.  Neither DCFS nor the court had reason to believe the children are Indian.  Even now, Mother makes no claim that she or any relative is Indian.  She has not shown prejudice from DCFS's failure to interview extended family members.  We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother has seven children born between 2001 and 2019.  DCFS has investigated the family multiple times since 2007.  Two children are the subject of this appeal:  E.G., Jr. (born in 2017) and Y.G. (2019).  Their father E.G. (Father) did not appeal the termination of parental rights.

When E.G., Jr. was three months old, DCFS learned that Father sold drugs, hiding them among the baby's clothes.  Mother was scratched and bruised from a violent altercation with Father, who choked and threatened to kill her; she attempted suicide and was involuntarily hospitalized. (§ 5150).  She told DCFS she took cocaine, methamphetamine and marijuana.  She heard voices, tried to smash a house window, punched her stomach while pregnant and drove while Father clung to the side of her car.  Though they sought mutual restraining orders, the parents intend to remain together.

E.G., Jr. was detained and deemed "at very high risk" of abuse and neglect.  He was placed with PGM, where he has remained for over four years.  Attached to the dependency petition filed in February 2018

---

[1] Unlabeled statutory references are to the Welfare and Institutions Code.

are "Indian Child Inquiry" forms stating that the children have "no known Indian ancestry."

On February 9, 2018, Mother and Father signed "Parental Notification of Indian Status" (ICWA-020) forms. They declared under penalty of perjury, "I have no Indian ancestry as far as I know." The detention report reads, "The parents . . . stated they do not have any Native American ancestry." At the detention hearing, the court cited the ICWA-020 form to find that Father has no Indian ancestry, to which his counsel said, "Correct." Mother asserted that the father of her oldest child is not Indian; the court replied, "Okay. Still no reason to know [ICWA] applies."

The minute order reads, "The Court does not have a reason to know that this is an Indian Child, as defined under ICWA, and does not order notice to any tribe or the BIA. Parents are to keep [DCFS], their Attorney and the Court aware of any new information relating to possible ICWA status. ICWA-020, the Parental Notification of Indian Status is signed and filed."

After detention, neither parent enrolled in a drug program. Mother missed most drug tests and Father tested positive for methamphetamine and marijuana. Mother confided to the social worker that Father threatened to kill her in the past; she fears he will harm her or the children if she leaves him. Mother was increasingly paranoid; her appearance and demeanor suggested possible drug abuse. PGM denied awareness of parental domestic violence but knew they abuse drugs. The parents, who lived in a car, had always left E.G., Jr. in PGM's care.

Mother was born in Mexico in 1985. When she met with the social worker in May 2018, she admitted missing drug tests but denied drug use or domestic violence. She claimed people are trying to kill her and her children are "hacking" into her phone and listening to her conversations. The older children were shaken by Mother's aggression. Though Mother cannot have drug paraphernalia or be under the influence at visits, PGM saw her with a pipe or bong while visiting E.G., Jr.

3

Born in Los Angeles to parents from Mexico, Father earns a living from "side jobs." He admitted a 10-year history of drug abuse but denied recent use of methamphetamine. He admitted slapping Mother but said she was "having a seizure" and he did not know what else to do. He denied threatening to kill her. By August 2018, neither parent visited E.G., Jr. or tested for drugs.

At the jurisdiction hearing on October 17, 2018, the court sustained an amended petition, finding that the parents failed to protect and endangered the children by engaging in violent physical and verbal altercations in the presence of the children, including choking, slapping, bruising, and a threat to kill; the parents' substance abuse prevents them from providing regular child care; Mother's mental and emotional problems and suicidal ideation make her incapable of providing regular child care. At disposition, the parents were ordered to participate in a full drug program, drug testing, domestic violence and parenting programs, and individual counseling. The children were removed from parental custody. The parents were allowed monitored visits.

In April 2019, DCFS reported that E.G., Jr. was bonded with PGM, with whom he has lived since infancy. His parents were homeless, slept on the streets and did not visit him. They ended contact with DCFS, so it was unknown if they enrolled in court-ordered programs. Mother was pregnant but did not have prenatal care. When she gave birth, prematurely, she and newborn Y.G. tested positive for methamphetamine.

DCFS detained Y.G. and filed a petition. An inquiry under ICWA showed Y.G. has no known Indian ancestry. Mother made delusional statements to the social worker and Father had open sores associated with use of methamphetamine.

Father was living in a car; he was aware of Mother's drug use because of her strange behavior but denied her accusation that he drugged her. DCFS found Y.G. at "very high" risk of danger from parental drug abuse, mental illness, and domestic violence. On April 22, 2019, the court found a prima facie case justifying detention and

4

removed Y.G. from parental care.  The parents disappeared after Y.G.'s birth and did not attend the hearing.

Y.G. was placed with PGM, who said the parents "are still doing drugs and living on the streets."  PGM reported that Y.G. experienced drug withdrawal, observing that her "limbs would shake."  The parents came to PGM's home once after Y.G.'s birth.  PGM allowed them to view the baby but not to touch her.  They did not seek further visits.

In May 2019, the court found the parents did not comply with the case plan; they do not visit or have a bond with E.G., Jr.  It terminated reunification services and set a permanency planning hearing for E.G., Jr.  The court sustained the petition as to Y.G., finding she is at serious risk of physical harm from being born with drugs in her system and from parental drug abuse, mental illness, and violence.  The court denied reunification services.  The parents did not attend the hearings.

In July 2019, Father told the DCFS social worker that he and Mother are homeless, sleep next to a freeway, and are unwilling to go to a shelter.  He was personally given notice of the section 366.26 hearing.  E.G., Jr. is thriving, happy and bonded with PGM, who has provided a loving home since he was a few months old.  PGM is committed to adopting him and Y.G.  The parents do not visit and have no parent-child bond.  Y.G. is thriving with PGM and meeting developmental milestones.  The parents occasionally appeared in PGM's neighborhood but made no effort to see Y.G. or arrange a visitation schedule with DCFS.

In March 2020, DCFS reported that Mother is incarcerated.  The social worker found Father on the streets.  She encouraged both parents to attend court hearings.  In January 2021, DCFS reported that Mother was in a criminal diversion program.  She spoke to the children by phone.  Father said he uses drugs, though less than before.  He hoped to resume his relationship with Mother once she completed her diversion program.  Four months later, Mother was still in the program, Father was still homeless and the children had "very minimal contact" with them.  Adoption was the proposed plan.

Mother sought a modification. The changed circumstances she cited are completion of an anger management class and a parenting program. She enrolled in a substance abuse outpatient program, a domestic violence support group and counseling, visits the children once a week, and has virtual visits every two days. She asked the court to return the children to her or reinstate family reunification services and allow unmonitored visits.

On May 18, 2021, the court conducted the permanency planning hearing, after many delays caused by the pandemic and DCFS's inability to locate the parents. The court denied Mother's request for a modification, observing that reunification services ended two years ago. Though Mother completed some of the case plan, the children have spent their entire lives with PGM, and Mother's sporadic visits are monitored. Resuming services is not in the children's best interests. DCFS and minors' counsel asked the court to terminate parental rights because there is no parent-child bond. The children are bonded with PGM, who plans to adopt them. The court found that the parents did not regularly visit, the parental bond exception to adoption does not apply, and the children are adoptable. It terminated parental rights and freed the children for adoption. PGM is the prospective adoptive parent. Mother appealed.

## DISCUSSION

The only issue Mother raises on appeal is the adequacy of the inquiry under ICWA. "We review a court's ICWA findings for substantial evidence.' [Citations.] 'We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance,'" and Mother " 'has the burden to show that the evidence was not sufficient to support the findings and orders.'" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885.)

DCFS inquired about Indian ancestry before filing the dependency petition. "Indian Child Inquiry" forms attached to the petition state that the parents offered no reason to believe the children are Indian. Both parents disclaimed Indian heritage in their ICWA-

6

020 forms. At the detention hearing, the court found ICWA does not apply, which Father's attorney confirmed. The court ordered the parents to inform DCFS, their attorneys and the court of any new information about possible ICWA status. Despite having the opportunity over three years to submit the names of persons who could be questioned, the parents never identified family members with Indian ancestry.

The court and DCFS carried out their duty to inquire if the children are or may be Indian children. (§ 224.2, subd. (a); *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069 [no duty to ask extended family about tribal membership under federal law].) There was no reason to know the children are Indian because (1) no person, tribe, or agency informed the court that the children are Indian; (2) they do not live on a reservation; (3) no participant informed the court of recently discovered information indicating Indian ancestry; (4) the children did not give the court reason to know they are Indian; (5) no one told the court the children are or have been wards of a tribal court; and (6) no one said the children have tribal membership cards. (§ 224.2, subd. (d)(1)-(6); Cal. Rules of Court, rule 5.481(b)(1)(A)–(F).)

No further inquiry under ICWA was triggered. No information was supplied "suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1); *In re Austin J., supra,* 47 Cal.App.5th at pp. 883–884.) DCFS and the court had no reason to doubt the parents correctly represented their Mexican heritage. "[T]he evidence already uncovered in the initial inquiry was sufficient for a reliable determination." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 743.)

Mother cites section 224.2, subdivision (b), which imposes a duty when a child is placed in county custody that includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." DCFS inquired about Indian ancestry, which both parents denied;

further inquiry showed that Mother and her relatives immigrated from Mexico, as did Father's parents.

The social worker had no reason to know, on this record, that an Indian child may be involved. (Cal. Rules of Court, rule 5.481(a)(4)(A).) The parents denied Indian ancestry and their extended relatives are from another country. The children have spent their lives with PGM, who is adopting them. Though Mother complains that PGM was not questioned, failure to ask a grandparent seeking to adopt the children about Indian heritage is harmless error. (*In re S.S.* (2022) 75 Cal.App.5th 575, 582–583 [an adopting grandparent has "a strong incentive" to disclose any Indian heritage to the court].)

Mother cites *In re Y.W.* (2021) 70 Cal.App.5th 542. It is inapposite. The father in that case declared he was or may be a member of a tribe; he wrote " 'Cherokee from Texas' " on his ICWA-020 form, told a social worker his grandmother is 95 percent Cherokee, and provided vital family information. The mother in *In re Y.W.* disclaimed Indian heritage but said she was adopted at age two and had no information about biological relatives. (*Id.* at p. 548; see also *In re N.G.* (2018) 27 Cal.App.5th 474, 478–481 [duty to inquire arose when the child's father signed an ICWA-020 form saying he had Indian ancestry and told the social worker his cousins are registered Cherokee tribe members].)

By contrast, DCFS had no evidence of a tribal link. Unlike the parents in *In re Y.W., supra,* 70 Cal.App.5th 542, Mother and Father never claimed Indian ancestry nor were they adopted or unaware of biological relatives. This is not a case in which the parents were missing and unavailable to report or deny Indian ancestry, giving rise to a duty to inquire with relatives. (*In re Benjamin M., supra,* 70 Cal.App.5th at pp. 744–745 [father never appeared in the case and could not be asked if his children are Indian]; *In re Josiah T.* (2021) 71 Cal.App.5th 388, 393, 403 [same].) Mother relies on cases in which ancestry is ambiguous; no such ambiguity exists here.

Even if there was a duty to interview extended family, we agree with our colleagues in Division One of this district that a parent

8

claiming ICWA deficiencies following termination of parental rights must show prejudice from DCFS's failure to conduct such interviews. (*In re Darian R.* (2022) 75 Cal.App.5th 502.) In *Darian R.*, as here, the parents denied Indian ancestry; neither parent was adopted or estranged from family; and for years, they were "under court order to continue providing information relevant to ICWA." (*Id.* at p. 510.) There was no basis for reversal because "[t]he record simply does not support mother's unvarnished contention that additional interviews of mother's father and sister would have meaningfully elucidated the children's Indian ancestry." (*Ibid.*)

Mother cites no evidence to support her claim that an Indian child may be involved, requiring further inquiry. When Mother and Father denied Indian ancestry in 2018, the court found ICWA did not apply and instructed them to inform DCFS, their attorneys, and the court of "any new information relating to possible ICWA status." At no time since 2018 has anyone suggested that the children are Indian.

Mother waited until this appeal, after parental rights were terminated, to assert that the inquiry was inadequate. Even now, she does not identify in her brief any association with a tribe or offer a reason to believe her children are Indian. (*In re A.C., supra,* 65 Cal.App.5th at p. 1069 [parent asserting failure to inquire must make an offer of proof or affirmatively claim Indian heritage on appeal]; *In re H.B.* (2008) 161 Cal.App.4th 115, 122 [ICWA " 'is not a "get out of jail free" card dealt to parents of non-Indian children, allowing them to avoid a termination order by withholding secret knowledge, keeping an extra ace up their sleeves' " without showing their hand on appeal]; *In re N.E.* (2008) 160 Cal.App.4th 766, 769 [ICWA error harmless because father "does not assert on appeal that he in fact has any Indian heritage"].) The record shows that Mother immigrated to the United States, as did Father's family. It is unlikely that foreign relatives are members of a U.S. tribe or could provide information likely to bear meaningfully upon whether the children are Indian.

"In sum, the record shows no prejudice flowing from DCFS's failure to interview" extended family members. (*In re Darian R., supra,*

75 Cal.App.5th at p. 510.)  Mother has not shown a reasonable probability of a more favorable result had relatives been interviewed or a miscarriage of justice.  (Cal. Const., art. VI, § 13; *In re S.S., supra,* 75 Cal.App.5th at p. 581; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1162.)

### DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.


10